**Dickey GAINES, Petitioner,**

v.

**James THIERET, Warden, Respondent.**

**No. 85 C 10386**

United States District Court, N.D.Illinois, E.D.

Aug. 5, 1987.

**1344**

David J. Bradford, Macarthur Justice Center, Niles, Ill., Jeffrey D. Colman, Terri L. Mascherin, Robert S. Markin, Jenner & Block, Chicago, Ill., for petitioner.

Mark Rotert, Atty. Gen. of Illinois, Chicago, Ill., Neil F. Hartigan, Joan Cherry, Richard M. Daley, Office of Cook County State's Atty., Richard J. Daley Center, Chicago, Ill., for respondent.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

Dickey Gaines, a/k/a Dickie Gaines ("Petitioner"), is currently incarcerated at the Menard Correctional Center under a sentence of death. He brought this habeas corpus action pursuant 28 U.S.C. § 2254 to redress what he claims are errors of constitutional magnitude at his trial and sentencing hearing. Petitioner raises some twenty-two alleged violations of his constitutional rights.[1] For the reasons set forth below, we conclude that Petitioner received ineffective assistance of counsel at his sentencing hearing, and that his sixth amendment rights were thus violated. Accordingly, Petitioner's sentence of death is vacated, and Petitioner is to be resentenced.

In October 1979, Petitioner was found guilty after a jury trial of the murders of Andre Davis and Causia McCall; the attempted murder of Lenious Thomas; armed violence against Davis, McCall, and Thomas; and the armed robbery of Davis and of Thomas.[2] A sentencing hearing was held at the State's request pursuant to Ill.Rev.Stat. ch. 38, § 9-1, after which the same jury that convicted Petitioner determined that Petitioner was to be sentenced to death.[3] On appeal, the Illinois Supreme Court reversed Petitioner's conviction on one count of armed robbery but otherwise affirmed his conviction and death sentence. *People v. Gaines*, 88 Ill.2d 342, 58 Ill.Dec. 795, 430 N.E.2d 1046 (1981). On March 3, 1982, Petitioner petitioned to the United States Supreme Court for a writ of certiorari. This petition was denied. *Gaines v. Illinois*, 456 U.S. 1001, 102 S.Ct. 2285, 73 L.Ed.2d 1295 (1982).

---

1. On June 12, 1987, Petitioner moved to amend his petition to add a twenty-third issue, alleging that the sentencing hearing was tainted by perjured testimony. Our ruling renders that motion moot.

2. The facts surrounding the crimes of which Petitioner has been convicted are not disputed in the proceedings in this court. Accordingly, we adopt the statement of facts set forth by the Illinois Supreme Court, and set forth in this opinion only such facts as are needed to resolve the pending motions.

3. § 9-1(g) provides, in relevant part:
"If there is a unanimous finding by the jury that one or more of the [statutory aggravating] factors set forth in subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death."
The jury in this case concluded that one or more statutory aggravating factors existed and that there were no mitigating factors sufficient to preclude the imposition of the death sentence (although this finding is transcribed by the court reporter—apparently incorrectly—as "we unanimously conclude that there are sufficient mitigating factors to preclude the imposition of the death penalty upon the Defendant, Dickey Gaines, and that the Court shall sentence the Defendant to death." Tr. at 942–43. The court then sentenced Petitioner to death. Tr. at 944, 952.

On November 8, 1982, Petitioner filed a post-conviction petition in the Circuit Court of Cook County. The petition was denied on March 9, 1983, and this decision was affirmed by the Illinois Supreme Court on November 30, 1984. *People v. Gaines,* 105 Ill.2d 79, 85 Ill.Dec. 269, 473 N.E.2d 868 (1984). Petitioner again petitioned for a writ of certiorari, which petition was denied on May 28, 1985. *Gaines v. Illinois,* 471 U.S. 1131, 105 S.Ct. 2666, 86 L.Ed.2d 282 (1985).

On November 15, 1985, after the Supreme Court denied certiorari, but before the mandate had issued from the Illinois Supreme Court, Petitioner sought leave in the Illinois Supreme Court to file an amended or successive post-conviction petition asserting a newly discovered claim and certain newly-discovered evidence. The Illinois Supreme Court denied this motion, and stayed Petitioner's execution pending the filing by Petitioner of a habeas corpus petition in federal court and entry of judgment by the highest federal court to adjudicate the petition. The Illinois Supreme Court ordered that Petitioner file his petition by December 18, 1985, and Petitioner complied with that order.

The current petition raises claims that may be divided roughly into three categories: (1) alleged errors at trial, (2) alleged errors at the sentencing hearing, and (3) claims challenging the constitutionality of Illinois' death penalty statute. We address the issues in this order.

## I. *Trial Errors*

### A. *Racial Discrimination in Voir Dire (Claim H)*

Petitioner first contends that the State violated his fourteenth amendment rights [4] by using peremptory challenges systematically and purposefully to exclude black members of the venire in Petitioner's case and in other capital cases in Cook County. Petitioner argues that the State's conduct

deprived Petitioner of his rights enunciated by the Supreme Court in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) and in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State argues that Petitioner is not entitled to the benefit of the Court's decision in *Batson,* and that Petitioner's *Swain* claim is barred by procedural default.

In *Swain,* the Supreme Court rejected an argument that the striking of blacks in a particular case could give rise to a claim of denial of equal protection of the laws. The Court acknowledged, however, that a state's deliberate exclusion of blacks as jurors in case after case might well constitute a violation of the Equal Protection Clause, indicating that a *prima facie* case of purposeful discrimination could be made out upon proof that in case after case, regardless of the circumstances, the prosecution was responsible for the removal of blacks who had been selected as qualified jurors and who would have survived challenges for cause, with the result that no blacks ever served on petit juries. A number of lower courts following *Swain* reasoned that proof of repeated striking of blacks over a number of cases was necessary to establish an equal protection violation. *See Batson,* 106 S.Ct. at 1720. The Court in *Batson* found that this interpretation of *Swain* "placed on defendants a crippling burden of proof," *id.,* such that "prosecutors' peremptory challenges are now largely immune from constitutional scrutiny." *Id.* at 1720–21. Thus, the Court rejected this evidentiary burden and held that a defendant could make a *prima facie* showing of purposeful discrimination based solely upon the prosecutor's exercise of peremptory challenges at his own trial by showing (1) that the defendant is a member of a cognizable racial group, (2) that the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the venire, and (3)

---

**4.** Petitioner also contends that the State's conduct violates his sixth and eighth amendment rights; however, these claims are addressed in only the most conclusory fashion in one footnote. The court finds this superficial discussion

insufficient to merit consideration or ruling. *See United States v. Bentley,* 825 F.2d 1104, 1109 (7th Cir.1987).

that the facts and circumstances surrounding the use of the challenges raise an inference that the prosecutor used that practice to exclude members of the venire from the petit jury on account of their race. *Id.* at 1722–23.

Petitioner argues that he states a claim under both the *Swain* standard and the *Batson* standard. Petitioner's position under *Batson* must fail, however, as the Supreme Court has made clear that while the *Batson* decision does apply retroactively to cases pending on direct appeal at the time the *Batson* decision was issued, *Griffith v. Kentucky,* — U.S. —, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), *Batson* does not apply to cases pending on collateral review of convictions that became final before that opinion was announced. *Allen v. Hardy,* — U.S. —, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (*per curiam* ).[5] Accordingly, even if Petitioner could show that the State engaged in purposeful racial discrimination during the *voir dire* in his case, he would not be entitled to relief on this basis.

With respect to Petitioner's argument that he states a claim under the *Swain* standard, the State insists that Petitioner never presented this claim to the state courts. We find that the State is correct. On direct appeal, Petitioner did not argue that the prosecution was exercising its peremptory challenges to exclude blacks from the venire in case after case such as to give rise to a valid claim under *Swain.* Rather, Petitioner argued that *Swain* presented too difficult a standard to meet and that the Illinois Supreme Court, which followed *Swain, see Gaines,* 85 Ill. Dec. at 274, 473 N.E.2d at 873, should

consider altering the standard to be applied to claims alleging violations of the state constitution, as other state supreme courts had done. The Illinois Supreme Court noted:

> The defendant's remaining objection to the jury goes to its racial composition. The defendant, who is black, states that the jury contained no black persons, and that that circumstance resulted from the prosecution's having used some of its peremptory challenges to exclude veniremen who were black but were not subject to removal for cause. The defendant concedes that under *Swain v. Alabama,* ... the motives of the prosecution in exercising peremptory challenges are not subject to examination absent a showing that blacks have been systematically prevented from serving on particular juries or from jury service in the county or State, *a showing not attempted here.* ... A similar position has been taken by this court in *People v. Harris* (1959), 17 Ill.2d 446, 450–51, 161 N.E.2d 809, *cert. denied* (1960), 362 U.S. 928, 80 S.Ct. 755, 4 L.Ed.2d 747....
>
> The defendant cites *People v. Wheeler* (1978), 22 Cal.3d 258, 583 P.2d 748, 148 Cal.Rptr. 890, and *Commonwealth v. Soares* (1979), 377 Mass. 461, 387 N.E.2d 499, *cert. denied* (1979), 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110, in which the supreme courts of California and of Massachusetts rejected *Swain,* and he urges that this court should follow their lead.

58 Ill.Dec. at 803, 430 N.E.2d at 1054 (emphasis added).[6] It is clear, therefore, that Petitioner made no attempt to state a federal constitutional claim, but instead made

---

5. Petitioner argues in a letter to this court dated July 10, 1987 that this case is still "pending" on direct appeal within the meaning of *Griffith.* This argument is without merit. *See Griffith,* 107 S.Ct. at 712 n. 6; *Allen,* 106 S.Ct. at 2880 n. 1. Petitioner also argues that this court should recognize an exception to the rule set forth in *Allen* for capital cases. Whatever the merits of this position, it is clear that the thrust of Petitioner's argument is that special care must be taken to ensure that racial bias does not infect the sentencing process. In view of our holding that the sentencing decision in this case is void in any event, we are concerned at this point

only with whether Petitioner is entitled to a new trial. *Allen* thus clearly controls here.

6. The court then found that Petitioner's case was not an appropriate one to address the question whether *Swain* should be rejected because Petitioner did not raise the issue until all the jurors had been sworn and because Petitioner had failed to make a record which would show that members of the venire who were peremptorily challenged by the State were black. *See Gaines,* 58 Ill.Dec. at 803, 430 N.E.2d at 1054.

a decision to try to change state law.[7] This is thus not a situation in which Petitioner raised a constitutional claim but simply *failed* to prove it,[8] but rather is a situation in which Petitioner, through his counsel, deliberately *chose* not to attempt to raise or prove the claim at all. It is settled law in Illinois that the failure to present a constitutional claim on direct appeal operates as a procedural default and hence a waiver of the claim. *United States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1313 (7th Cir. 1986). *See also Dently v. Lane*, 712 F.2d 1172, 1176 (7th Cir.1983) (quoting *Goins v. People*, 103 Ill.App.3d 596, 59 Ill.Dec. 312, 313–14, 431 N.E.2d 1069, 1070–71 (1981)).

Upon review of the denial of Petitioner's post-conviction petition, the Illinois Supreme Court noted that Petitioner was making the same claim that he had made on appeal, i.e., that the prosecution had engaged in discrimination *in his case.* The court found this claim barred by *res judicata,* and again noted that Petitioner had not raised a *Swain* issue in his post-conviction petition:

> [U]nder the holding of *Swain v. Alabama* (1965), 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, ... the defendant's claim regarding jury selection is insufficient to raise an issue of constitutional proportion. In *Swain,* the court held that "the Constitution [does not] requir[e] an examination of the prosecutor's reasons for the exercise of his challenges in any given case." ... Rather, a constitutional issue is raised only when the record demonstrates that blacks in a particular county or State have been consistently and systematically denied the opportunity to serve on juries.... Defendant makes no such showing in his petition for post-conviction relief. Neither the petition nor the affidavit [asserting that the state utilized its peremptory challenges "to exclude five or six black jurors"]

raises the issue of the case-by-case exclusion of blacks required by *Swain.* As such, defendant's assertions regarding the State's use of its peremptory challenges do not raise an issue of 'substantial denial of his rights under the Constitution' as required by the Post-Conviction Hearing Act....

85 Ill.Dec. at 274, 473 N.E.2d at 873. Thus, the Illinois Supreme Court made clear that if Petitioner had not waived his *Swain* claim on direct appeal, he certainly had waived it in the post-conviction proceedings.[9]

Petitioner "raised" this claim for the first time in his motion to the Illinois Supreme Court for leave to file an amended or a successive post-conviction petition, in which he urged that he be allowed to present newly-discovered evidence regarding the racial composition of juries in capital cases, as that newly-discovered evidence "is necessarily of recent origin and could not have been asserted previously." Resp. Exh. K at 21–22. Although Petitioner characterized his request as one to expand the record to include new evidence of a claim already raised, it is clear from reviewing the Illinois Supreme Court's two earlier opinions that the court *never* considered a claim of case-after-case discrimination to have been raised before. As we earlier noted, Petitioner had explicitly argued up until this late point in the state court proceedings that he *could not* make such a claim. The Illinois Supreme Court denied Petitioner's request for leave to amend without opinion; however, taking all of the court's pronouncements on this particular question into account, there can be little doubt that it denied Petitioner leave to raise a *Swain* claim based on racial discrimination in case after case on waiver grounds. *See, e.g., Harris v. Reed,* 822 F.2d 684, 687 (7th Cir.1987) (where there is

---

7. *Cf. United States ex rel. Duncan v. O'Leary,* 806 F.2d 1307, 1314 (7th Cir.1986).

8. *Cf.* note 23 *infra* and accompanying text.

9. Petitioner's assertion that he raised a claim of systematic discrimination under the *Swain* standard in his petition for certiorari is belied by his own brief to the Supreme Court. *See, e.g.,* Pet.

App.Exh. HH at 1 ("Petitioner has squarely raised, as the *exclusive* question presented in this Petition, the identical question that this Court will resolve in *Batson v. Kentucky....*" (emphasis added)); *id.* at 8 ("This Court should reverse its decision in *Swain v. Alabama,* particularly as it applies to a capital case.").

neither an explicit finding of waiver nor an expression of intention to ignore waiver, reviewing court should try to assess state court's intention to the extent possible).

Accordingly, Petitioner is barred from raising his *Swain* claim in this court unless he can show cause for his failure to comply with the state procedural rule and actual prejudice resulting from the alleged constitutional violation. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *United States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1313 (7th Cir. 1986). We conclude that Petitioner has not made this showing.

Petitioner urges first that he had "cause" for any procedural default because the factual basis for his claim was not reasonably available to counsel. Specifically, Petitioner asserts that he was one of the first black defendants in Cook County to be convicted and sentenced to death by a jury, and therefore could not have demonstrated the State's pattern of discrimination in other death penalty cases. We do not understand why Petitioner takes the position that his showing of discrimination must be limited to capital cases.[10] As the Supreme Court stated in *Swain:*

> [W]hen the prosecutor in a county, in case after case, *whatever the circumstances, whatever the crime and whoever the defendant or the victim may be,* is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance.

380 U.S. at 223, 85 S.Ct. at 837 (emphasis added). In light of the Supreme Court's discussion in *Swain,* it seems to us that Petitioner could have, and perhaps should have, attempted to make a factual showing of racial discrimination by the State in the *voir dire* process by providing information

on the State's conduct in a variety of different criminal proceedings. Certainly evidence regarding the selection of jurors in other murder cases or cases involving other particularly serious offenses would have been relevant to the factual showing Petitioner needed to make under the *Swain* standard. Petitioner makes no claim, nor could he, that such evidence was not reasonably available to counsel at the appropriate times. Accordingly, we reject Petitioner's argument that he has established "cause" for his procedural default on this basis.

Petitioner next urges in the alternative that "if any failure to object or to make a better record waives this claim as a matter of state law, that failure was the result of ineffective assistance [of counsel]." Pet. Br., Sept. 19, 1986, at 93–94. This contention is wholly without merit. While the Supreme Court has held that ineffective assistance of counsel does establish cause for a procedural default, *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397 (1986), the Court made clear that the showing a petitioner must make is no less than that which he must show in order to establish that his representation was constitutionally defective:

> We think ... that the question of cause for a procedural default does not turn on whether counsel erred or on the kind of error counsel may have made. So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington,* [466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ] we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default. Instead, we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense imped-

---

**10.** We are especially puzzled by Petitioner's view that he should only rely on those cases in which the jury returned a death sentence. The prosecution, of course, cannot possibly know at the time of the *voir dire* that the jury it participates in selecting will eventually determine that

the death penalty should be imposed. Thus it seems incongruous to us to argue that the prosecution routinely engages in unconstitutional racial discrimination in all cases in which black defendants are sentenced to death. *See* Pet.Rep. Br., Nov. 26, 1986, at 37, 42.

ed counsel's efforts to comply with the State's procedural rule. 106 S.Ct. at 2645–46.

With respect to his *Swain* claim, Petitioner cannot make the required showing. Petitioner's counsel was clearly apprised of the applicable federal and Illinois precedents, as well as the developing law in other state supreme courts. It is clear that counsel made a strategic decision based on this existing law to argue that *Swain* required a showing that was too difficult, and should be rejected by the Illinois Supreme Court as the appropriate standard under Illinois law, as it had been rejected in California and Massachusetts by the supreme courts of those states. This decision, while unsuccessful, cannot be deemed to fall outside the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.[11] Petitioner did not receive ineffective assistance of counsel that would establish cause for his procedural default.

Petitioner's failure to establish "cause" obviates the need for us to examine the "prejudice" prong of the analysis. We conclude that Petitioner is barred from raising his claim based on *Swain v. Alabama* in this court.

B. *The Death Qualification Process (Claim I)*

 Petitioner contends next that the trial court's *voir dire* examination, during which thirty-two jurors were excluded based upon their responses to the judge's questions concerning the death penalty,[12] created a jury that was biased in favor of finding Petitioner guilty.[13] Petitioner urges that he has provided unrefuted expert affidavits in support of this contention.[14] Petitioner offers the affidavit of Edward H. Bronson, a professor of political science at the California State University at Chico. Professor Bronson reviewed the transcript of Petitioner's *voir dire* and concluded that the death qualification process in this case "made the jurors who survived that process more conviction-prone and more likely to vote for death than they otherwise would have been." Bronson affid., Habeas Pet.Exh. B, ¶ 18. Professor Bronson indicates his concern that the trial judge's questions regarding the death penalty asked the jurors to assume Petitioner's guilt; that the questions referred to the possibility of the death penalty without referring to any other possible penalty; and that the *voir dire* was not sequestered, with the result that the jurors were "cued" that the court disapproved of those who expressed opposition to the death penalty. Petitioner also offered affidavits on this issue from Professor Hans Zeisel of the University of Chicago, and Professor Reid Hastie of Northwestern University.

While Petitioner has taken great pains to prove that the *voir dire* in this case resulted in a jury more likely to convict him, Petitioner is somewhat ambiguous as to why this evidence, even if accepted, proves

11. Although we, of course, review the reasonableness of counsel's performance as of the time of that performance, *see Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, we do also note that the very argument Petitioner's counsel pressed on Petitioner's behalf ultimately prevailed in the United States Supreme Court in *Batson*.

12. The process of examining prospective jurors with respect to their views concerning the death penalty and excusing for cause any prospective juror whose views "'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath,'" *Wainwright v. Witt*, 469 U.S. 412, 433, 105 S.Ct. 844, 857, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)), is commonly referred to as the "death qualification" process. We will employ that term as well.

13. Petitioner argues that this examination also created a jury that was biased in favor of sentencing him to death. In light of our holding vacating his death sentence, we need not address this argument. Similarly, we need not reach Petitioner's claim (Claim J) that the trial court made several rulings that resulted in jurors' being excused for cause in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

14. Petitioner also maintains that the Illinois Supreme Court's reversal of Petitioner's conviction for the armed robbery of Andre Davis is further evidence that the jury was predisposed toward guilt. We are entirely unpersuaded by this argument.

that his conviction is unconstitutional. In *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court *un*ambiguously held that even if social scientific evidence could establish that death qualification produces a jury more prone to convict,[15] the Constitution nonetheless does not prohibit the states from death qualifying juries in capital cases.[16] The Court found that death qualification violates neither a defendant's right to a jury selected from a representative cross-section of the community nor his right to an impartial jury.

Petitioner argues that *McCree* stands only for the proposition that the death qualification process does not *per se* violate a defendant's constitutional rights, and that *McCree* left open the possibility that a defendant could still prove that *in his case* the *voir dire* produced a jury more likely to convict. Petitioner insists that his unrefut-

ed expert affidavits provide such proof. Petitioner's argument is without merit. As we noted previously, the Court's decision in *McCree* did not turn on whether the respondent could make the evidentiary showing that his jury was more likely to convict him; the Court simply *assumed* that he had made such a showing, in his case and in *all* cases in which the death qualification process is used. It then went on to find that death qualification, *even though* producing juries more likely to convict, does not offend the Constitution. The Supreme Court's decision is dispositive, and thus binding on this court.

Similarly, Petitioner asserts that his case is distinguishable from *McCree* because the respondent in *McCree* "concede[d] that the individual jurors who served at his trial were impartial." *See McCree*, 106 S.Ct. at 1767. This argument is also without merit.[17] As the Court's opinion made clear,

---

**15.** The Court in *McCree* assumed for purposes of the decision that the social scientific evidence established the conviction proneness of death qualified juries, but noted that in fact it was unpersuaded by the evidence before it that such was the case. *See* 106 U.S. at 1762–64.

**16.** Petitioner argues, at least with respect to this particular claim (*Cf.* Claim H), that this case was not a "capital case" at the time the *voir dire* was conducted because the State had not yet given notice of its intention to seek the death penalty. Petitioner notes that the Supreme Court granted certiorari in *Buchanan v. Kentucky*, — U.S. —, 106 S.Ct. 2245, 90 L.Ed.2d 691 (1986) in order to, according to Petitioner, "resolve the question whether it violates due process to death-qualify a jury before trial when, as here, the accused does *not then* face capital punishment." Pet.Br., Sept. 19, 1986, at 101 (first emphasis in original, second supplied). Petitioner then goes on to explain that "[i]n this case, as in *Buchanan*, the State had not sought the death penalty when the court conducted the death qualification voir dire.... The grant of certiorari in *Buchanan* demonstrates that *Lockhart [v. McCree]* is not dispositive of the issue raised here." *Id.*
Petitioner's characterization of *Buchanan* is misleading at best. In *Buchanan*, two co-defendants were jointly tried by a jury. One co-defendant faced the possibility of the death penalty; defendant Buchanan, however, did not, as he had successfully moved prior to trial to have the capital portion of his indictment dismissed. The jury impaneled for the purpose of determining the guilt of both defendants was death qualified. *See Buchanan v. Commonwealth*, 691 S.W.2d 210 (Ky.1985). Thus, the issue to be

resolved by the Supreme Court was not, as Petitioner asserts, "whether it violates due process to death-qualify a jury before trial when ... the accused does not *then* face capital punishment;" rather, the issue was whether it is unconstitutional to death qualify a jury when the accused does not face capital punishment *at all*. *Buchanan*, in short, has nothing to do with the present case. Furthermore, even if *Buchanan* could somehow be deemed relevant to this case, the Supreme Court has now decided *Buchanan* and ruled that, in fact, *McCree* is dispositive. *Buchanan v. Kentucky*, — U.S. —, 107 S.Ct. 2906, 96 L.Ed.2d 336 (1987). Petitioner's argument, accordingly, must be rejected.

**17.** Also without merit is Petitioner's argument that Arkansas has a valid state interest in conducting the death qualification *voir dire* prior to trial but that Illinois has no such valid interest. The fact that Illinois is willing, "for good cause shown," § 9–1(d)(2)(C), to discharge the jury that returns a conviction and impanel a new one for sentencing does not diminish the State's "concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial." *McCree*, 106 S.Ct. at 1766. *See also id.* at 1768. It is true, as Petitioner points out, that at the time of the *voir dire* the State had not yet indicated its intention to seek the death penalty. Petitioner may also be correct that a defendant might have a cognizable claim if the State death qualified a jury prior to trial but then did not seek the death penalty upon conviction; however, that issue is not before us since the State did in fact seek the death penalty against Petitioner. *See id.* at 1766 n. 16.

what the respondent had conceded was that he had no claim that the jurors were affected by such irregularities as pretrial publicity, *ex parte* communications, or other undue influence. *See id.* The Court noted:

In short, McCree does not claim that his conviction was tainted by any of the kinds of jury bias or partiality that we have previously recognized as violative of the Constitution. Instead, McCree argues that his jury lacked impartiality because the absence of *"Witherspoon*-excludables" "slanted" the jury in favor of conviction.

*Id.* Petitioner, like the respondent in *McCree,* has made no claim of partiality other than that his jury was "slanted" toward conviction because the jury was death qualified.[18] Again, we find that *McCree* is controlling.

Finally, although Petitioner argues that his *voir dire* was uniquely defective, the affidavits, though unrefuted by the State, do not establish that Petitioner's *voir dire* process was any different from that which the Court considered in *McCree.* In fact, the contrary is implied. *See, e.g.,* Bronson affid., Habeas Pet. Exh. B, ¶ 9 ("In the *Gaines* voir dire, *as in many other voir dires that I have read,* the judge asked prospective jurors to assume that the defendant will be found guilty." (emphasis added)). The affidavits merely point to particular aspects of the questioning which, in these affiants' opinions, caused the resulting jury to be more likely to convict Petitioner. The affidavits do not state that the process used in Petitioner's case differed from that employed in other capital cases in which a proper *voir dire* was conducted. For all these reasons, we find Petitioner's claim to be without merit.

**18.** To the extent Petitioner is arguing that the very process of questioning prospective jurors about their views on the death penalty deprived him of his constitutional rights, the Court in *McCree* made clear that such an argument must be rejected. *See* 106 S.Ct. at 1763 n. 7.

**19.** Petitioner, citing *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), argues that "[i]n order for Dickey Gaines to be sentenced to death, the State had to show that he either attempted to kill or actually killed Davis and McCall." Pet.Br., Sept. 19, 1986, at

## C. *The Confrontation Clause (Claim K)*

Petitioner and his brother, Michael Gaines, were originally named in a single indictment. Prior to trial, Petitioner's counsel moved for a severance because Michael Gaines had made several inculpatory statements to the police, many of which not only implicated Petitioner but also named him as the killer.[19] The State did not object to the motion and the court granted the severance.

During Petitioner's trial, the State called Chicago Police Department investigator Robert Dwyer. *See* Tr. at 632–77. Dwyer testified that in December of 1978, he was present in the Gaines residence when Petitioner telephoned his mother. After receiving Mrs. Gaines' permission to listen to the conversation on the extension telephone, Dwyer then overheard several incriminating statements made by Petitioner to his mother and his brother, Michael. Those incriminating statements were related by Dwyer to the jury. The prosecutor then directed Dwyer's attention to early January of 1979 when Dwyer interviewed Petitioner in custody. Dwyer testified that after he gave an appropriate *Miranda* warning, he explained to Petitioner some of the evidence that he had gathered against him. Specifically, Dwyer testified as follows:

A: To the best of my recollection I informed him that he had just been identified by an eyewitness as the individual who had shot and killed Mr. Davis and Mr. McCall.

I also told him that he had been implicated by his own brother as the person who shot and killed these two—

110. Petitioner urges that Michael Gaines' hearsay statements, *see* discussion *infra,* provided the only direct evidence as to who shot Davis and McCall. As we explain further below, Petitioner is incorrect that these statements provided the only direct evidence that Petitioner was the killer. Moreover, we, in any event, point out that Petitioner's interpretation of *Enmund* has been expressly rejected by the Supreme Court. *Tison v. Arizona,* —— U.S. ——, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

Mr. Walsh: I'll object Judge. Move for a mistrial.

The Court: Objection overruled. Motion for mistrial is denied.

Mr. Boyle: Q Please continue, officer.

A: I also called to his attention that we did in fact have the murder weapon in custody and that his brother had given us an accounting of the whole sequence of events.

Tr. at 648.

Petitioner did not comment on or make any statement concerning Dwyer's accusation. The State's ostensible purpose at trial for permitting Dwyer to testify to Michael Gaines' out-of-court assertion was that the testimony was "foundational." Although Dwyer's testimony was admitted by the trial judge apparently on this basis, we are baffled by the State's position at trial. If by that argument the State meant that the hearsay statement was appropriate because Petitioner later adopted or approved it in his response and thus Dwyer's statement became attributable to Petitioner, the State is simply wrong. Petitioner did not adopt or approve any of Dwyer's statements except to admit by inference that he had in fact spoken on the telephone with his mother and brother in December (an admission which had nothing whatsoever to do with the confession of Michael Gaines). *See* Tr. at 654. Petitioner made no comment of any kind in response to Dwyer's statement concerning Michael Gaines' statements. Before this court the State has argued that Dwyer's statement was not offered for the truth of the matter contained in it—namely, that Michael Gaines had identified Petitioner as the killer—but only to show that Dwyer in fact made the statement (whether true or false) to show the circumstances under which Gaines' later admission about talking on the telephone had been made. In support of this position, the State relies on *Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), reliance which can most charitably be described as a misunderstanding of the holding in *Street* and of the hearsay rule. It is of course true, as recognized in *Street,* that a confession of a third party implicating the defendant can

be introduced at the trial of the defendant for non-hearsay purposes. In *Street,* for instance, the confession of the accomplice was introduced to rebut Street's claim that he was coerced into making his confession and that he simply parrotted his accomplice's confession. The Supreme Court approved the use of the accomplice's confession, not to implicate the defendant, but to demonstrate that the defendant's confession contained details not present in his accomplice's confession. Thus, the Supreme Court recognized that when there is a non-hearsay purpose to be served, a confession of another person may be admissible. The State's reliance on *Street* is undercut by the absence of any relevant non-hearsay purpose for Michael Gaines' confession. The placing of Michael Gaines' statement before the jury is completely irrelevant to Petitioner's comments to Dwyer concerning his telephone call. Further, in *Street,* the jury was instructed by the trial judge that it should not consider the confession by the accomplice as true. No such instruction was given during Petitioner's trial.

We believe this case presents a clear confrontation problem under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). In *Bruton,* the Supreme Court held that because of the substantial risk that the jury would look to the incriminating extrajudicial statements made by a co-defendant in determining the defendant's guilt, the admission of the co-defendant's confession into evidence violated the defendant's right of cross-examination secured by the confrontation clause of the sixth amendment. *See also Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). In this case, the jury heard a hearsay statement implicating Petitioner in the murder and naming him as the trigger man. The jury could certainly have considered such a statement as true, particularly in the absence of any limiting instructions. Thus, we find that Dwyer's statement concerning a confession by Michael Gaines which named Petitioner as the killer violated Petitioner's rights under the sixth amendment. Such a finding does not

end our inquiry, however. We must now determine whether the constitutional violation was harmless. *See Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

■ Initially, we note that Dwyer's statement about Michael Gaines' confession which implicated Petitioner was a single statement in the course of a trial which lasted many days. After the statement was only partially completed, it was interrupted by an objection, and when the testimony continued, the statement was not referred to again. Neither the prosecution nor the defense counsel ever questioned any other witness about the statement, it was ignored during the cross-examination of Dwyer, and neither side discussed it or even mentioned it during closing argument.

Secondly, quite apart from the inadmissible statement by Dwyer and contrary to Petitioner's assertions in his briefs, there *was* independent evidence not only that Petitioner participated in the murder of two people, but in fact that he was their killer. That evidence was received from an eyewitness whose credibility was substantially unimpeached at trial. Lenious Thomas testified to the circumstances leading up to the murders and told the jury that he had seen Petitioner with a gun. The testimony continued as follows: ·

A: Well, after he said "Stick-up," I had my hand in my pocket, you know. I had two dollars in there so I pulled it out, you know.

Q: As you pulled the money out, what happened then?

A: *I turned toward him,* you know, turned my *head over there and he shot.*

Q: When you say "he shot," who shot?

A: Dickey Gaines.

Q: After he fired that shot, what happened then?

A: I fell to the floor and *he kept on shooting.*

Tr. at 491 (emphasis added).

Thus, an eyewitness with no known motive to lie identified Petitioner as the killer.

During the cross-examination, Thomas admitted that he fell to the floor after the first shot and was face down on the floor for much of the shooting, but that testimony does not discredit the witness' earlier assertion that he saw Petitioner continue to shoot. No witness even suggested that anyone else had a gun. Thomas' testimony was corroborated in substantial measure by Petitioner himself during his telephone call with his brother, Michael, on November 23, 1978, which was overheard by Dwyer. In that conversation, Petitioner admitted his participation in the murders—"Don't you know they can give us the chair for what we done?" Tr. at 639.

The Illinois Supreme Court found that the uncontroverted eyewitness testimony of Thomas was sufficient to sustain Petitioner's conviction for murder and that any error in admitting Dwyer's testimony concerning the statement by Petitioner's brother was harmless. *Gaines,* 58 Ill.Dec. at 807, 430 N.E.2d at 1058. We agree with the conclusions of the Illinois Supreme Court for the reasons stated above.

### D. *Eavesdropping (Claim L)*

■ As set forth above, Dwyer testified at trial that he had received the consent of Petitioner's mother to listen on an extension telephone to a conversation between Petitioner and his mother. Dwyer stayed on the line after this conversation ended, and then also overheard a conversation between Petitioner and his brother, Michael. In these conversations, Petitioner admitted his participation in the murders, and Dwyer testified as to the contents of these conversations over counsel's objection that Dwyer had engaged in illegal eavesdropping. *See* Tr. at 636.

Petitioner contends that the admission of this testimony into evidence deprived Petitioner of his rights under the fourth amendment and Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.* The parties dispute whether Petitioner has committed a procedural default with respect to these claims. We need not decide whether the claims are

barred by procedural default, however, as we conclude in any event that neither the fourth amendment claim nor the Title III claim is cognizable on habeas review.

With respect to the fourth amendment claim, the Supreme Court held in *Stone v. Powell*, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976), that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Petitioner concedes that he did not rely upon the fourth amendment (or on Title III) in his pretrial motion to suppress, but instead limited his argument to showing violations of the Illinois eavesdropping statute, Ill.Rev.Stat. ch. 38, § 14-1 *et seq.*, and the Illinois Constitution. *See* Pet.App.Exh. JJ. He apparently takes the rather remarkable position that because he did not raise a fourth amendment claim in his pretrial suppression motion, he never received a hearing on the claim in the state trial court, and that since he never received a hearing on his fourth amendment claim in the state trial court, his assertion of that claim in this court is not barred by *Powell*. *See* Pet.Br., Sept. 19, 1986, at 120.

This "logic" is simply untenable. The Court in *Powell* did not hold, as Petitioner implies, that a petitioner is entitled to have his fourth amendment claim reviewed by a federal habeas court whenever the state court did not hold a hearing on the claim. Rather, the Court held that a state prisoner may not be granted federal habeas corpus relief on the basis of a fourth amendment violation when the State has provided the *opportunity* for full and fair litigation of

that claim. Petitioner is hardly in a position to complain that the State did not provide him with such an opportunity, given the fact that Petitioner did not even raise a fourth amendment claim in his pretrial motion, let alone seek an evidentiary hearing or otherwise request an opportunity to litigate such a claim. The State did not fail to provide Petitioner with an opportunity for full and fair litigation of a fourth amendment claim; the undeniable fact is that the State did not hold a hearing on Petitioner's fourth amendment claim because Petitioner never asked for one or in any way attempted to make a showing that he was entitled to one.[20] *Powell* thus applies to this case.[21]

With respect to the Title III claim, the Seventh Circuit has made clear that because a violation of that federal statute is neither constitutional nor jurisdictional, it is cognizable on habeas review only if it resulted in "a 'complete miscarriage of justice' or in a proceeding 'inconsistent with the rudimentary demands of fair procedure.'" *Hussong v. Warden*, 623 F.2d 1185, 1190 (7th Cir.1980) (quoting *United States v. Timmreck*, 441 U.S. 780, 784, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979)). As we indicated above, Petitioner is in a poor position at this point to argue that the violation resulted in a proceeding "inconsistent with the rudimentary demands of fair procedure." Nor are we persuaded that the violation, assuming for purposes of our decision that there is one, resulted in a "complete miscarriage of justice." As the Seventh Circuit noted in *Hussong:*

Although Hussong has alleged a substantive violation of federal law, the fact is that he was convicted on the basis of qualitatively unimpaired evidence—even

---

**20.** Petitioner apparently did argue on appeal to the Illinois Supreme Court that his fourth amendment rights had been violated. The Illinois Supreme Court rejected this argument. *Gaines,* 58 Ill.Dec. at 806, 430 N.E.2d at 1057. On review of the denial of post-conviction relief, the Illinois Supreme Court found the claim barred by *res judicata* principles. *Gaines,* 85 Ill.Dec. at 275, 473 N.E.2d at 874.

**21.** We also reject Petitioner's contention that his failure to raise or litigate a fourth amendment

claim was the result of ineffective assistance of counsel. The transcript of the hearing on the motion to suppress makes clear that Petitioner's counsel was aware of the applicable state and federal precedents, and made a strategic decision to rely on the more stringent Illinois law. *See* Pet.App.Exh. JJ. This decision cannot be deemed unreasonable. *See Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

though it may have been tainted because of procedural irregularities.... This court has noted the Supreme Court's observation that evidence obtained in violation of search and seizure law is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant.... Thus, we have no reason to think that Hussong was not convicted on the basis of probative and reliable evidence, even if that evidence was wrongfully admitted. In short, there is nothing in the record to indicate that Hussong is not guilty of the crime for which he was convicted.

623 F.2d at 1191 (citations omitted).

This case similarly presents no indication that Petitioner is not guilty of the murders for which he was convicted. *See Gaines*, 58 Ill.Dec. at 798, 430 N.E.2d at 1049 ("Except with respect to the charges of armed robbery of Thomas and Davis no claim is made that the defendant's guilt was not proved beyond a reasonable doubt."). Thus, we can find no basic injustice in his current incarceration, and conclude that although his claim might present an issue for a court on direct appeal, it does not rise to the level of injustice that would justify habeas review.

## II. *Sentencing Errors*

Petitioner argues that his constitutional rights were violated in a variety of ways at his sentencing hearing. We agree with Petitioner's claim that he did not receive effective assistance of counsel at that hearing. Accordingly, we conclude on this basis that Petitioner is entitled to be resentenced, and we do not reach his additional claims of error at the sentencing hearing.[22]

*Ineffective Assistance of Counsel (Claim A)*

Petitioner argues that his sixth amendment right to counsel was violated, in essence because his defense counsel, Mr. Carl Walsh, did not subject the State's case against him to any meaningful adversarial testing. Petitioner's attack on Mr. Walsh's representation is made on several fronts. He argues primarily that Mr. Walsh conducted no meaningful investigation to determine the existence of mitigating evidence, and presented no evidence in mitigation at the sentencing hearing despite the fact that a substantial amount of such evidence existed. Petitioner contends that this failure constitutes both *per se* and actual ineffective assistance of counsel. Petitioner further maintains that Mr. Walsh failed to conduct any meaningful cross-examination of any of the State's witnesses; that counsel failed to object to several misleading or erroneous statements of the law by both the prosecutor and the trial judge; and finally, that Mr. Walsh failed to give any meaningful, much less persuasive, opening or closing statement at the sentencing hearing. We conclude that Mr. Walsh's performance, considered in its totality, was actually ineffective; accordingly, we do not reach Petitioner's broader argument of *per se* ineffectiveness.

■ As a preliminary matter, the State argues that Petitioner committed a procedural default by failing to present the available mitigating evidence to the state courts, and thus Petitioner has waived his opportunity to present the factual basis for his claim in this court. The State acknowledges that this " 'factual default' theory ... is not supported by any explicit holding of the United States Supreme Court or the Seventh Circuit," Resp. Letter to Court, Feb. 17, 1987, at 6, but argues nonetheless that we should adopt such a principle in this case, "for a contrary conclusion means that [this court] would be entitled to assess constitutional claims, and facts supporting those claims, even though the Supreme Court of Illinois, through no fault of its own, was never afforded a fair opportunity to do likewise." *Id.*

---

22. Petitioner also asserted as constitutional error (1) that the prosecutor made prejudicial remarks during his closing argument, (2) that the trial court permitted two jury bailiffs to testify against him at the sentencing hearing, (3) that the trial court denied Petitioner his right of allocution, (4) that the prosecutor effectively denied Petitioner a presentence investigation report by convening a capital sentencing hearing, and (5) that the cumulative prejudice from the foregoing errors deprived Petitioner of a fair sentencing hearing.

We are not persuaded by the State's argument. The State does not deny that Petitioner has raised his *claim* of ineffective assistance of counsel at every available opportunity. *See Gaines*, 85 Ill.Dec. at 278, 473 N.E.2d at 875 (Illinois Supreme Court found ineffective assistance claim not waived). The State contends only that Petitioner failed to present the *factual support* for his claim to the state courts. This distinction, we believe, renders a procedural default analysis inapplicable.[23] Petitioner simply did not default on the claim; he made the claim but failed to prove it. Under these circumstances, the Supreme Court has made clear that we have the power to take evidence on the claim in this court. In *Townsend v. Sain*, 372 U.S. 293, 309, 83 S.Ct. 745, 755, 9 L.Ed.2d 770 (1963), the Court noted that "[t]he problem of the power and duty of federal judges, on habeas corpus, to hold evidentiary hearings—that is, to try issues of fact anew—is a recurring one." (footnote omitted). The court then resolved the issue, stating:

> In construing the mandate of Congress, so plainly designed to afford a trial-type proceeding in federal court for state prisoners aggrieved by unconstitutional detentions, this Court has consistently upheld the power of the federal courts on habeas corpus to take evidence relevant to claims of such detention....
>
> The rule could not be otherwise. The whole history of the writ—its unique development—refutes a construction of the federal courts' habeas corpus powers that would assimilate their task to that of courts of appellate review. The function on habeas is different. It is to test by way of an original civil proceeding, independent of the normal channels of review of criminal judgments, the very gravest allegations.... The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary. Therefore, where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew.

*Id.* at 311–12, 83 S.Ct. at 756–57. The State does not argue that this precedent from the Supreme Court is inapplicable to the case before us; in fact, the State does not address this precedent at all.[24]

*States ex rel. Duncan v. O'Leary*, 806 F.2d 1307, 1313–14 (7th Cir.1986).

---

**23.** A comparison between this situation and the one we considered earlier with respect to Petitioner's claim of racial discrimination in the *voir dire* process is useful. In the latter context, the State (correctly, we believe) argued that Petitioner had *not only* failed to provide factual support for a contention that the prosecution violated the equal protection clause by acting in a racially discriminatory fashion in case after case, but that Petitioner in fact had never even *argued* to the state courts (until he attempted to amend his post-conviction petition) that the prosecution had discriminated in case after case. In fact, Petitioner, through counsel, deliberately *chose* not to make such an argument to the state courts, and then attempted to argue case after case discrimination in federal court. In the former context, by contrast, the State does not, indeed cannot, deny that Petitioner did argue to the state courts that his lawyer was ineffective for failing to introduce and argue mitigating evidence. Rather, the State's *only* complaint is that Petitioner's contention in the state courts was a bald one, devoid of any factual support. Thus, Petitioner, in our view, committed a procedural default with respect to the racial discrimination issue, but not with respect to the mitigating evidence issue. *See United*

**24.** We note on our own that the *Townsend* Court relied, in part, on the Court's decision in *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), holding that a federal court should consider the merits of a petitioner's habeas corpus claim unless the petitioner had "deliberately bypassed" the orderly procedure of the state courts. *Noia* was overruled in part by the Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), in which the Court held that the test for determining whether a claim not previously raised in the state courts should be considered by a federal court is not the "deliberate bypass" test stated in *Noia*, but rather is the more stringent "cause and prejudice" test described in *Sykes*. Nonetheless, we reiterate our distinction that the *Sykes* Court was specifically concerned only with the treatment of unraised *claims*. With respect to the question of *factfinding* in the federal proceeding, by contrast, the Court indicated that the question had already been fully addressed in *Townsend* and was not being reconsidered in *Sykes. See* 433 U.S. at 80–81, 87, 97 S.Ct. at 2503, 2506–07.

■ That a federal court has such power does not mean that it should exercise that power in every case. Although we disagree with the State that the issue presented raises a question of procedural default,[25] we certainly appreciate the State's concern that principles of comity be considered. The State's point that the facts in support of Petitioner's ineffective assistance claim were not presented on appeal or in the petition for post-conviction relief is well taken,[26] and many courts have recognized that under those circumstances the federal court should not address the claim, not because the claim or evidence is barred by procedural default, but rather because the petitioner has not exhausted his available state court remedies. For example, in *Rodriguez v. McKaskle*, 724 F.2d 463 (5th Cir.), *cert. denied*, 469 U.S. 1039, 105 S.Ct. 520, 83 L.Ed.2d 408 (1984), the court explained that under 28 U.S.C. § 2254(b), a state prisoner must exhaust all available state remedies before coming to federal court, and further explained that to have exhausted his state remedies, a petitioner must have "fairly presented" the substance of his claims to the state courts. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). Generally, the *Rodriguez* court concluded, the exhaustion requirement is not satisfied if a petitioner presents an entirely new set of facts to the federal court. *See Rodriguez*, 724 F.2d at 466. Similarly, the court in *Sampson v. Love*, 782 F.2d 53, 55–57 (6th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 159, 93 L.Ed.2d 98 (1986), held that when the evidence presented in conjunction with a federal habeas petition places the petitioner's claim in a significantly different posture than that at the state level, the state court should be given the opportunity to consider the claim in that posture. *See also Stranghoener v. Black*, 720 F.2d 1005, 1007 (8th Cir.1983) ("Based on the Court's reasoning in *Picard*, we hold that a federal claim is not 'fairly presented' to the state courts when factual allegations significantly affecting the determination of that claim are raised for the first time in federal court."); *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir.1983), *cert. denied*, 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984); *Hudson v. Rushen*, 686 F.2d 826, 830 (9th Cir.1982), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983); *Anderson v. Cassles*, 531 F.2d 682, 684 (2d Cir.1976); *Johnson v. United States District Court*, 519 F.2d 738, 740 (8th Cir.1975).

The exhaustion requirement serves to "protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982). Thus, the exhaustion requirement provides the state courts the first opportunity to consider claims and, if those claims are meritorious, to redress violations of constitutional rights of state prisoners. *See Sampson*, 782 F.2d at 55. Given the function of the exhaustion requirement, it is quite understandable that federal courts have been reluctant to consider claims that, although raised below, are significantly changed at the federal level because of the introduction of new evidence, often, as in this case, the very evidence the state courts found lacking. *See Gaines*, 85 Ill.Dec. at 279, 473 N.E.2d at 876.

---

**25.** The State appears to argue that Petitioner violated a procedural rule by failing to attach affidavits to his post-conviction petition, as required by the Illinois Post-Conviction Act, Ill. Rev.Stat. ch. 38, § 122–2. However, such a failure is not in itself necessarily fatal to the petition. *People v. Ford*, 99 Ill.App.3d 973, 55 Ill. Dec. 365, 368, 426 N.E.2d 340, 343 (1981) (citing *People v. Newberry*, 55 Ill.2d 74, 302 N.E.2d 34 (1973)). Moreover, even if Illinois generally enforces such a procedural rule, we reiterate that the Illinois Supreme Court ignored any such waiver in this case, reached the merits of Petitioner's claim, and concluded only that because Petitioner had failed to present affidavits, Petitioner had not made out a claim of ineffective assistance and was not entitled to an evidentiary hearing. *Gaines*, 85 Ill.Dec. at 278–79, 473 N.E.2d at 875–76.

**26.** The failure to press the issue on direct appeal is, of course, understandable since, as the Illinois Supreme Court noted, Petitioner was represented by the same attorney at trial and on direct appeal, and thus "[i]t would be unreasonable to expect appellate counsel to convincingly raise and argue his own incompetency." *Gaines*, 85 Ill.Dec. at 278, 473 N.E.2d at 875.

Petitioner in this case was clearly aware of his obligation to exhaust his available state court remedies. In November 1985, after his post-conviction appeals were completed but before the mandate had issued, Petitioner filed a motion in the Illinois Supreme Court for a stay of execution to permit him to amend his post-conviction petition or, in the alternative, to file a second petition. As an exhibit to that motion, Petitioner attached all of the evidence he now presents to this court. Petitioner expressly pointed out that he was filing the motion in order to fulfill his obligation to exhaust his available state court remedies, stating:

> By this motion to amend, petitioner seeks to assure that this Court has a full and fair opportunity to consider this newly-discovered ... evidence.
>
> . . . . .
>
> Under *Rose v. Lundy*, ... this Court should be given "the first opportunity to review all claims of constitutional error." ... [A]s a matter of sound judicial administration, this Court should be given this opportunity to reconsider certain claims in light of the newly discovered evidence.

Resp.Exh. K at 2, 20. Petitioner urged the Illinois Supreme Court to grant a stay and to remand the case for an evidentiary hearing on Petitioner's ineffective assistance claim.

In an order dated December 10, 1985, the Illinois Supreme Court summarily denied Petitioner's motion to amend his petition.

The court granted the motion to stay issuance of the mandate and Petitioner's execution "provided that the appellant shall file a petition for a writ of Federal *habeas corpus* on or prior to December 18, 1985, and provided further that the appellant shall on or prior to December 26, 1985, file with the clerk of this court a certification that he has filed said petition for a writ of *habeas corpus* and a copy of said petition." Resp.Exh. L.[27] The Illinois Supreme Court's order makes quite clear that Petitioner's day in state court was over, and that if Petitioner wished to contest the action taken against him any further, he must proceed, and proceed quickly, in federal court.

The exhaustion requirement presupposes that an available state court remedy exists. In view of Petitioner's attempt to place before the Illinois Supreme Court the evidence he currently presses in this court, and in further view of the Illinois Supreme Court's denial of that request and its granting Petitioner only eight additional[28] days in which to file a habeas petition in federal court or else lose his stay, there can be no doubt that Petitioner had no remaining available state court remedies, and that any further attempts to proceed in the state courts would have been futile (and perhaps fatal). *See Perry v. Fairman,* 702 F.2d 119 (7th Cir.1983); *United States ex rel. Williams v. Brantley,* 502 F.2d 1383 (7th Cir.1974).[29] Under these circumstances, and given the magnitude of Petitioner's

---

**27.** Justices Clark and Simon dissented from the portion of the court's order denying Petitioner's motion to amend his post-conviction petition.

**28.** Following the Supreme Court's denial of certiorari to review the denial of Petitioner's post-conviction petition, the Illinois Supreme Court stayed Petitioner's execution for approximately six months. It was toward the end of this six-month period that Petitioner filed his motion for leave to file an amended or a second post-conviction petition. Our point is not that the Illinois Supreme Court did not provide Petitioner with adequate time in which to prepare his federal habeas petition, but only that the December 10, 1985 order extending Petitioner's stay only eight more days left no question that Petitioner was not to pursue any further remedies in state court.

**29.** Arguably, under this precedent from the Seventh Circuit, Petitioner would be deemed to have exhausted his available state court remedies even without filing his motion for leave to amend. Since Illinois strictly applies the principles of *res judicata* to petitions for post-conviction relief, Petitioner likely could have relied on this in concluding that the Illinois courts, having already relaxed the application of the *res judicata* doctrine once with respect to this claim, *see Gaines,* 85 Ill.Dec. at 278, 473 N.E.2d at 875, would refuse to do so again in order to reconsider that same claim. *See Perry,* 702 F.2d at 121. Since Petitioner did in fact make the effort to place the new evidence before the state courts, we, of course, need not decide this issue.

constitutional claim, we conclude that it is appropriate for us to consider the merits of Petitioner's ineffective assistance claim, taking into account the evidence he has supplied. *See Townsend*, 372 U.S. at 318, 83 S.Ct. at 760. Accordingly, we proceed to the merits.

■ The analysis of Petitioner's claim of ineffective assistance initially requires an understanding of the basic principles governing the adjudication of this constitutional claim, as well as the state law governing Petitioner's sentencing hearing. Thus, we begin with the necessary background.

The standard for deciding whether a claim of actual ineffective assistance of counsel rises to the level of a constitutional deprivation was set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Noting that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," *id.* at 686, 104 S.Ct. at 2064, the Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. at 2064.

In announcing this standard, the Court made clear that "[j]udicial scrutiny of counsel's performance must be highly defer-ential," *id.* at 689, 104 S.Ct. at 2065, and that "every effort [must] be made to eliminate the distorting effects of hindsight." *Id.* Thus, with respect to the performance component, the Court stated that "the defendant must show that counsel's representation fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2064, and that a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). With respect to the prejudice component, the Court indicated that because the purpose of the Sixth Amendment is to assure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution. *See id.* at 691–92, 104 S.Ct. at 2066–67. To make this showing of prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. It is with this framework from the Supreme Court that we undertake a review of Petitioner's claim.

A decision whether the failure to investigate or present mitigating evidence at Petitioner's sentencing hearing constitutes ineffective assistance requires an understanding of the role mitigation plays under the Illinois death penalty statute, Ill.Rev. Stat. ch. 38, § 9–1. The statute first defines the crime of murder. It then elaborately explains the nature of the sentencing process. Upon the defendant's conviction, the State may request a separate sentencing hearing in order that a determination may be made as to whether the death pen-

alty shall be imposed. § 9–1(d). The hearing takes place either before the court or before a jury, generally at the option of the defendant. This hearing is conducted in two stages. At the first stage, the statute requires the State under subsection (b) to establish that the defendant is eligible for the death penalty by proving beyond a reasonable doubt that the defendant has been found guilty of murder, that he had attained the age of 18 at the time of the commission of the crime, and that at least one of the statutory aggravating factors listed in subsection (b) exists. § 9–1(e), (f). If the sentencer finds that these statutory requirements have been proved beyond a reasonable doubt, the proceedings then move into the second and final stage, at which the sentencer determines whether the death penalty should be imposed upon this particular eligible defendant. It is at this second stage that mitigating information becomes important.

At the second stage, information relevant to any other aggravating or any mitigating factors may be presented by either the State or the defendant without regard to the rules ordinarily governing the admission of evidence at criminal trials. § 9–1(e). The statute provides examples of mitigating factors, but indicates that the list is not exhaustive. § 9–1(c). At the conclusion of this final stage, the jury determines whether the death penalty is to be imposed. In making that determination, the sentencer is required to consider all relevant aggravating and mitigating factors. Under § 9–1(g):

> If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

> Unless the jury unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death sentence the court shall sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Corrections.

*See also* § 9–1(h) (same procedure when court is sentencer).

Thus, the Illinois death penalty statute expressly provides for the presentation of information relevant to *any* mitigating factors, *see* § 9–1(c); *People v. Johnson*, 114 Ill.2d 170, 102 Ill.Dec. 342, 359, 499 N.E.2d 1355, 1372 (1986), and requires the sentencer to consider these mitigating factors as part of its deliberation. Only if the sentencer unanimously finds that there are no mitigating factors sufficient to preclude the imposition of the death penalty is the sentencer empowered to return a death sentence. However, in those cases in which the sentencer does make this finding, the court must sentence the defendant to death. This review of the statutory scheme makes clear that mitigating factors play an extremely important role in the determination whether a defendant shall live or die.

As we earlier noted, Petitioner's sentence was determined by the same jury that determined his guilt. At the first stage of the sentencing hearing, the State proved that Petitioner was at least 18 years old at the time of the commission of the murders and that he had been convicted of two murders in the course of an armed robbery. Petitioner presented no evidence at that phase, and the jury found Petitioner eligible for the death penalty.

At the second stage, the State presented five witnesses in aggravation. The first was Paulette Rubio, who testified that she was a school teacher and that in March 1976, while she was walking to a teacher's meeting, three teenagers, including Petitioner, knocked her down and took her purse. Ms. Rubio testified that she was visibly pregnant at the time.[30] She further indicated that she signed a complaint against Petitioner and testified against him at his trial, at which he was found guilty.

The State next called Virginia ("Lala") Harris, who testified that she had been dating Petitioner for a period of months

---

**30.** Various portions of the transcript transcribe the prosecutor's remarks as indicating that Ms. Rubio was "physically" pregnant at the time.

*See, e.g.,* Tr. at 857, 863. We assume this to be an error in transcription. *See, e.g.,* Tr. at 920 ("visably" [sic] pregnant).

before the murders. Ms. Harris gave damaging testimony, indicating, for example, that she had asked Petitioner why he had killed the two victims and he had responded that "he wouldn't have killed them" and that "none of this would have happened" if she had not left him. *See* Tr. at 871. She also testified that Petitioner made threatening remarks to her, both by telephone and by letter. *See* Tr. at 873–75. On cross-examination, Mr. Walsh's only questions to Ms. Harris referred to the date on one of the letters introduced by the State.

The State then called Michelle Munson, a friend of Ms. Harris, who related a conversation Munson had had with Petitioner a few days after the murders. Munson testified that Petitioner threatened Harris, and further testified that Petitioner also stated: "Two people are dead. One more he wouldn't get no more time than what he'll get anyway." Tr. at 890. Walsh's cross-examination was limited to an inquiry as to whether Ms. Munson could recognize Petitioner's voice. Munson remained steadfast in her identification of Petitioner's voice.

The State's final two witnesses were deputy sheriffs who were responsible for security at the courthouse. The deputy sheriffs testified that their responsibilities included searching prisoners, maintaining building security, and maintaining order in the courtroom. Deputy Sheriff Fitzgerald testified that on one occasion Petitioner swung his fists at him when Fitzgerald removed his handcuffs and that on another occasion, with Deputy Sheriff Bergquist also present, Petitioner threatened to kill one of the deputy sheriffs. *See* Tr. at 899. Deputy Sheriff Bergquist corroborated this incident, Tr. at 902, and further testified that on yet another occasion, Bergquist

searched Petitioner before bringing him into the courtroom and found a steel pick, two hack saw blades in the bottom of Petitioner's shoes, and a ten dollar bill. On cross-examination, Petitioner's counsel asked the deputy sheriffs if they had been in the courtroom during the trial and if they had taken oaths as deputy bailiffs for the jury. Both responded affirmatively to both questions.

The State then rested. Given the evidence presented by the State at the guilt phase and in aggravation at the sentencing phase, there could be little doubt at that point in the proceedings that in the absence of mitigating evidence, the death penalty would almost certainly be imposed. Petitioner had been convicted of a double murder in the course of an armed robbery, and thus he was twice eligible for the death penalty. He was also convicted of attempting to kill yet a third person. The evidence at the trial established no conceivable justification for the murders; Petitioner had, through an apparently utterly senseless act, taken the lives of two people and tried to take a third. Moreover, the State's evidence at the trial and sentencing hearing revealed, among other things, that having already killed two people, Petitioner no longer feared the consequences of additional murders, and had threatened to kill Ms. Harris; had threatened his brother, *see* Tr. at 639; and had also threatened to kill one of the deputy sheriffs. Thus, the State quite successfully portrayed Petitioner as a cold, inhuman killer. Viewed at the time of the hearing, the evidence in the record made the imposition of the death penalty a strong probability in the absence of mitigating evidence.[31]

---

**31.** We do not mean to imply that mitigating factors, as envisioned by the statute, may only be found by looking to mitigating evidence presented by the defendant at the sentencing hearing. The Illinois Supreme Court has made clear that the sentencer must consider mitigating facts, whether they are revealed at the trial or sentencing hearing, and whether they are brought out by the State or the defendant. *See, e.g., People v. Johnson,* 114 Ill.2d 170, 102 Ill. Dec. 342, 359, 499 N.E.2d 1355, 1372 (1986); *People v. Lewis,* 88 Ill.2d 129, 58 Ill.Dec. 895, 901–02, 430 N.E.2d 1346, 1352–53 (1981), *cert.*

denied, 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982). Our point is merely that, given the particular situation in which Petitioner found himself at the close of the State's case in aggravation, it was highly improbable that even a single juror in this case could consider the possibility, from the evidence so far presented, that there might be mitigating factors which were sufficient to preclude the imposition of the death penalty. Accordingly, there was a strong probability, in the absence of some presentation by Petitioner, that the jury would make the requisite unanimous finding required for the

Mr. Walsh, during the evidentiary hearing before this court, testified that he came to this very conclusion himself at the time of Petitioner's sentencing hearing. For example, Walsh testified at the evidentiary hearing that:

A. In answer to your question, I have to say that it was discussed with Mr. Gaines, the fact that if no testimony were offered to the jury and if he was not given an opportunity either to make a statement in the nature of a statement under the right of allocution or take the stand himself, if nothing was presented to the jury I know I thoroughly discussed with him that the probable only result that would be obtained was that the jury would impose the death penalty.

Q. So you believed when you decided not to call any witnesses if you didn't call any witnesses, you didn't call Mr. Gaines, and he wasn't allowed to exercise his right to allocution, that in all probability he would be sentenced to death, is that correct?

A. Yes, sir.

Evid.Hrg.Tr. I at 49. Walsh repeated this view in answer to questions from the State:

Q. Now, you said that you told Dickie Gaines that in your opinion the jury would most probably return a verdict of the death penalty if no mitigation evidence was presented, is that correct?

A. Yes.

Q. And you told him this during the course of your advice to him on what evidence, if any, you would present, correct?

A. Yes.

Evid.Hrg.Tr. I at 101. *See also id.* at 102 ("I communicated to him that we would still have the opportunity of arguing and that the jury could still, notwithstanding the lack of mitigating testimony or evidence, still return a verdict against the death penalty, however, I told him that in my opinion without mitigation there was *virtually no chance* that that would happen.") (emphasis added).

Finally, on redirect, Mr. Walsh indicated for a fourth time that he thought Petitioner would likely receive the death penalty if he did not introduce anything in mitigation:

Q. Now, you say that you didn't believe the death penalty would follow automatically if no mitigating evidence was presented, but you thought it was a very strong probability, didn't you?

A. Yes, at the very least.

Tr. at 121. In short, Petitioner's counsel expressly testified that in his view, the failure to introduce mitigating evidence, the very action taken in this case, would in all probability result in a death sentence.

It is in this context that we must evaluate Mr. Walsh's decision to rest without introducing any mitigating evidence at trial. The reasonableness of this decision depends first on what mitigating evidence was available at the time of the hearing, and second, on what strategy counsel devised in order to give the jury a reason to spare Petitioner. We address the two points separately.

The record reveals that at the time of the hearing, Petitioner's family was available to testify that Petitioner had been repeatedly and severely beaten by his father, sometimes after first being stripped naked and tied up. *See* Evid.Hrg.Tr. II at 43–46, Habeas Pet.Exhs. E–F, I, P–Q, S. The record also shows that for the six-month period immediately prior to the murders, Petitioner held a good job at which he worked hard, behaved responsibly, and generally earned the respect and trust of his employer, Mr. Pauli. Habeas Pet.Exh. G. Further, there is uncontradicted evidence showing that up until shortly before the murders, Petitioner lived with Ms. Harris and her son and was very kind to both of them and worked hard to help support them. Evid.Hrg.Tr. II at 67; Habeas Pet. Exh. R. The record also reveals that Petitioner was arrested at the age of 15 after an incident involving a fight with four white youths, and was sentenced to one year in jail. Petitioner was placed in an

imposition of the death penalty, i.e., that there were no mitigating factors sufficient to preclude it.

adult prison, where he spent time in isolation and in a psychiatric ward. He remained in an adult prison until his mother was able to obtain an attorney, who brought Petitioner's birth certificate to the attention of the judge. Family members and friends were available to testify that this experience had a seriously disturbing effect on Petitioner, who, prior to that time, had not been in any trouble. *See* Evid.Hrg.Tr. II at 45; Habeas Pet.Exhs. E–F, H–I, K, M, P–Q, S. Finally, the record shows that various other people were available to testify generally to Petitioner's good character. *See* Habeas Pet. Exhs. J, L, N, O.

Walsh testified that he was unable to recall many of the details surrounding his investigation of possible mitigating evidence.[32] He did recall having numerous conversations with Petitioner in the lockup, and also recalled talking with some family members, "a girlfriend" (Ms. Harris), and an employer. Evid.Hrg.Tr. I at 26. Counsel could not remember specifically asking about the existence of mitigating evidence, but testified that such is his practice in all cases. Walsh testified that at the time of the sentencing hearing, he knew of Petitioner's conviction at age 15 and placement in an adult prison, knew of Petitioner's positive employment record, and knew that he had cared for Ms. Harris and her baby.

There was a great deal of evidence, however, about which Walsh apparently did not know. First, there is no evidence to suggest that Walsh did any meaningful investigation of the facts and evidence to be presented by the State in aggravation. For example, Walsh testified that he did not obtain a transcript of the trial at which Ms. Rubio testified against Petitioner. Evid. Hrg.Tr. I at 69. Had he done so, Walsh would have discovered that Ms. Rubio could not identify Petitioner either as the person who had knocked her down or as the person who took her purse. *See* Rubio

Tr. at 23–24. Although Walsh testified that he simply could not recall whether he knew this information at the time of the sentencing hearing, we conclude on the basis of his testimony that he did not know this information at the time of the hearing. Further, the record does not reflect that Walsh knew that Petitioner's mother and other family members were prepared to testify that Petitioner had been severely beaten by his father. Such evidence is unquestionably mitigating. *See Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Nor does the record show that Walsh engaged in any significant investigation of the facts surrounding Petitioner's juvenile arrest and conviction. Furthermore, although Walsh testified that he spoke to a number of people about the sentencing hearing, Walsh's time sheets indicate that he spent a total of only eight hours on Petitioner's case between Wednesday, October 10, 1979, the date on which the trial ended, and Monday, October 15, 1979, the date on which the sentencing hearing began. Moreover, although these hours are not itemized, counsel testified that he spent "substantial time," which he recalled as being "some period of hours" beginning after the guilty verdict, assisting Petitioner in preparing a statement that Petitioner wished to make in his own behalf. Evid.Hrg.Tr. I at 56. Accordingly, there does not appear to be a great deal of time remaining which counsel would have spent preparing for the hearing. On this record, we must conclude that Walsh could well have performed a more thorough investigation of the potential mitigating evidence, and that his somewhat superficial preparation resulted in his being unaware of significant mitigating evidence.[33]

Although Walsh clearly was not aware of all the mitigating evidence, the record reveals that he did have knowledge of some of it. Walsh decided to introduce none of this evidence. The Supreme Court has rec-

---

**32.** Walsh was asked if he had any documents memorializing his investigation in preparation for the sentencing hearing. Walsh indicated that his normal practice is to keep notes on legal pads, but that he could find no such legal pads in his files. *See* Evid.Hrg.Tr. I at 31.

**33.** We need not decide whether this incomplete investigation in itself constituted ineffective assistance of counsel, for it is only one factor leading us to our ultimate conclusion.

ognized that the competency of such a decision must be judged in light of counsel's overall strategy. In *Strickland*, for example, defense counsel failed to present evidence in mitigation at the sentencing hearing, relying instead on his knowledge of the sentencing judge and an earlier plea colloquy in which the defendant's expression of remorse had been well received by the court.[34] Similarly, in *Burger v. Kemp*, — U.S. —, —, — n. 6, 107 S.Ct. 3114, 3121–22, 3122 n. 6, 97 L.Ed.2d 638 (1987), defense counsel's strategy at the sentencing hearing was to plead for mercy by arguing, on the facts of the case, that the petitioner was considerably less culpable than another defendant involved in the crime and that the petitioner's actions resulted from the other defendant's strong influence upon the petitioner's will. Counsel made the tactical decision not to offer mitigating evidence which not only had a substantial downside risk, but which also threatened to undercut this strategy. *See id.* at —, 107 S.Ct. at 3126.

In this case, by contrast, after reviewing the transcript of the sentencing hearing and Walsh's testimony, we are unable to discern any strategy at all developed by Walsh which would form the basis for an argument to the jury that Petitioner should not be executed. Walsh did not testify to any overall theory of defense, such as was present in *Strickland* (reliance on plea colloquy) and *Burger* (reliance on lesser culpability).[35] Nor is any such theory apparent from any other portion of the record. Our conclusion that counsel had no strategy at all is substantiated by what can only be described as perfunctory arguments to the jury during the second phase of the sentencing hearing. During opening statements, for example, the State described at some length the evidence in aggravation it would be presenting, including threats Petitioner had made on the lives of Ms. Harris and the deputy sheriffs. The State was clearly preparing to portray Petitioner as a dangerous murderer whose life should not be spared. Petitioner's counsel made no response to the State's argument at all.

**34.** The record in *Strickland* revealed that counsel's decision not to search extensively for character witnesses who were available was based upon a competent judgment to argue that respondent was under extreme emotional disturbance at the time of his crimes and to rely on the earlier plea colloquy, in which the respondent told the trial judge that he accepted responsibility for his crimes and in which the judge told the respondent that he had a great deal of respect for people who admit their responsibility, but that he was making no statement as to his likely sentencing decision. The Court noted that the trial judge's view on the importance of accepting responsibility for one's crimes was well known to counsel. The Court also found that the respondent suffered no prejudice because the evidence that would have been admitted would not have greatly altered the sentencing profile, as it consisted mostly of statements from people who thought the respondent was generally a good person. The Court found that there was no reasonable probability that this evidence would have altered the sentencing decision, given the overwhelming aggravating factors, and further found that some of the evidence might have been more harmful to his case. The Court thus concluded that "respondent has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance. Respondent's sentencing proceeding was not fundamentally unfair." 466 U.S. at 700, 104 S.Ct. at 2071.

**35.** Mr. Walsh did testify at one point to having an "overall strategy that we weren't going to call any other witnesses...." Evid.Hrg.Tr. I at 54. We discuss the problems with this "strategy" in greater detail below. It does appear from counsel's testimony that if he had any real strategy in mind, it was to rely on a statement to the jury by Petitioner himself. Mr. Walsh testified to his efforts in assisting Petitioner in the preparation of such a statement and his request to the judge that Petitioner be allowed to make that statement without being placed under oath and without being subjected to cross-examination. Evid. Hrg.Tr. I at 54–58. The court denied this request before the commencement of the second phase of the sentencing hearing, Tr. at 853, and denied Petitioner's renewed request, made at the close of the State's case in aggravation. Tr. at 913. The court also denied Petitioner's motion for a mistrial on this basis. Tr. at 914. In view of these denials, we need not decide whether Walsh's decision would have constituted a reasonable defense strategy. Nor need we decide whether counsel acted reasonably in advising Petitioner not to testify, but rather to preserve his claim of "allocution" for appeal. *See* Evid. Hrg.Tr. I at 59. The point is that once counsel's strategy was destroyed by the court's refusal to allow him to implement it, counsel was obligated to devise an alternative theory. The record reveals no indication that he did so.

Rather, his statement to the jury provided, in its entirety:

> Ladies and gentlemen, at this hearing, we are going through today, the stage of the proceeding where the State is asking you to decide whether that man lives or dies. It is up to you. It is your decision. They are asking you to kill Dickey Gaines. I am asking you to let him live and go to prison. Thank you.

Tr. at 859. This argument certainly gave no indication that counsel had developed any kind of a theory as to why Petitioner's life should be spared. Instead, counsel appeared simply to ignore the State's argument entirely and to ask the jury to do the same.

Counsel's closing argument disclosed no indication of a theory of defense either. The State in closing recounted the testimony at the trial and sentencing hearing, and portrayed Petitioner as "a vicious, cold-blooded killer to whom human life means absolutely nothing." Tr. at 921. The State argued to the jury that, in its opinion, the jury simply had no choice on the question of sentence.[36]

The only statement Walsh made to the jury suggesting a theory of defense against the death penalty was his reference to Petitioner's youth. However, counsel did not even argue this point with any vigor, stating simply: "Are you ready to kill this young man? He is twenty years old. Not very old at all." Tr. at 924. After arguing briefly that the incident involving Ms. Rubio was not particularly brutal and that this incident was the only evidence the jury had heard of a prior criminal history, counsel confined his argument generally to an attempt to persuade the jury that it should simply reject the death penalty altogether. *See, e.g.,* Tr. at 925 ("Killing people is wrong.... Does it make it any better that the State is going

to kill someone?"); Tr. at 926 ("Dickey Gaines didn't have any right to take away life, but neither do you....").

At the hearing before this court, Walsh gave two explanations for his failure to present and argue the available mitigating evidence. Walsh first testified that he decided not to put on any of the evidence because the derogatory information that would have been revealed would have outweighed any helpful information. *See, e.g.,* Evid.Hrg.Tr. I at 44–45, 48. For example, counsel testified that he felt Petitioner's mother was angry at Petitioner for involving his brother Michael in the crimes, and that the rest of Petitioner's family seemed generally hostile toward him. He further testified that he recalled learning from Ms. Harris that she had moved away from Petitioner because Petitioner had been beating her. He also indicated that he did not put in evidence as to Petitioner's juvenile incarceration because he had not seen any mention of the offense in Petitioner's "rap" sheets and did not think the State knew about it. Thus, he decided to keep the evidence of additional criminal conduct from the jury.

We have already recognized that such an explanation may well reflect a reasonable decision in a situation in which counsel has a theory of defense that does not entail the use of mitigating evidence, *see, e.g., Strickland,* 466 U.S. at 699, 104 S.Ct. at 2070; *Green v. Zant,* 738 F.2d 1529, 1536–37 (11th Cir.), *cert. denied,* 469 U.S. 1098, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984), or a theory which might be adversely affected by the use of such evidence, *see, e.g., Burger,* — U.S. at —, 107 S.Ct. at 3125; *McClesky v. Kemp,* 753 F.2d 877, 900 (11th Cir.1985), *aff'd,* — U.S. —, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Thus, counsel is free to develop any reasonable strategy at sen-

---

**36.** The State erroneously argued to the jury that there was no reason why its verdict should not be "to recommend to the Court that the Death Penalty be imposed upon Dickey Gaines." Tr. at 923. The jury's function, under the Illinois statute, is much more important than the prosecutor indicated, since the statute clearly provides that the court *shall* impose a death sentence if the jury unanimously finds that there

are no mitigating factors sufficient to preclude it. Thus, the jury's role was not to make a *recommendation* to the judge for his consideration; it was to *inform* the judge of the judgment he was required to enter. Petitioner's counsel did not object to the State's misleading argument. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

tencing. Obviously, counsel is not obligated to introduce evidence that will make things worse for his client. The problem with counsel's explanation as applied to this case, as compared to those cited above, is that counsel had no ascertainable theory that either diminished the need for mitigating evidence or would be contradicted by the introduction of the available mitigating evidence. Indeed, Mr. Walsh indicated his view that the death penalty was a virtual certainty without mitigating evidence. Under these circumstances, the fact that the evidence might be viewed as "double-edged" is irrelevant, for unless Walsh had devised a strategy which could have been adversely affected by the mitigating evidence or which did not require its use, Walsh simply gave up something for nothing.

Moreover, although we need not reach the issue for our decision, we note that counsel's expressed concern about presenting this evidence ignored the fact that much of the damage had already been done. Petitioner's mother, for example, had already testified *for the State*, albeit only to provide Petitioner's birth date. Whatever the State might have elicited from her on cross-examination about her being angry with Petitioner, Mr. Walsh knew that Petitioner's mother would testify that she did not want Petitioner to die. Evid.Hrg.Tr. I at 114, 129. She could also have testified that Petitioner was severely beaten by his father, testimony which has no apparent downside. Without any testimony from Mrs. Gaines, it could only appear to the jury that even his own mother had nothing good to say about him, and, in fact, would testify only for the State.

Similarly, although the jury had not heard any evidence that Ms. Harris left Petitioner because he was beating her (assuming the truth of this assertion and further assuming that Ms. Harris would have so testified), the jury *had* already heard that Petitioner had threatened Ms. Harris by telephone and again by letter. Walsh

testified that he did not cross-examine Harris because she was coming across as very hostile. Evid.Hrg.Tr. I at 115. Whatever her demeanor while on the witness stand, the fact is that the worst of the bad news was already before the jury, and Ms. Harris had dealt Petitioner a serious blow by testifying against him. Without any substantive questioning by Walsh about Petitioner's earlier kindness to her and her son, the jury was left with only a negative view of their relationship.

The remaining mitigating evidence available simply had no downside risk. Arguably, the jury might not attach much weight to the testimony of Petitioner's siblings; however, something is still better than nothing. Even if counsel had the sense that Petitioner's family was generally hostile toward him, and even if we accept the State's contention that Walsh's sense was in fact accurate,[37] we again point out that there is no evidence that the family members would not testify in his behalf or that they wanted Petitioner to receive the death penalty. In fact, counsel testified that he likely never explained to any member of the family that there was a good chance Petitioner would receive the death penalty if no mitigating evidence were introduced. Evid.Hrg.Tr. I at 118–19. In addition to any general testimony about his character, these witnesses also could have testified that Petitioner was beaten by his father.

Mr. Walsh conceded that there was nothing double-edged about Mr. Pauli's testimony. Walsh testified that he nonetheless decided not to use it seemingly because it would not have been particularly helpful in the absence of any other mitigating evidence, given the short term of Petitioner's employment. Evid.Hrg.Tr. I at 45–46. However, Mr. Pauli's testimony would have provided much-needed evidence that Petitioner was capable of making some contri-

---

**37.** The State has provided the court with certain police reports indicating that Petitioner was apprehended through the help of family members, primarily Petitioner's mother. These police reports had been turned over to Mr. Walsh prior to trial.

bution to society and that his life was not completely worthless.[38]

Mr. Walsh's second explanation for his failure to introduce mitigating evidence was that such was Petitioner's wish. Walsh testified that he thoroughly discussed this decision with Petitioner, *see* Evid.Hrg.Tr. I at 48–49, and that Petitioner indicated "that he had wanted nothing to do with any of the members of his family, he wanted none of them called, and that he didn't think that any evidence should then be put on." Evid.Hrg.Tr. I at 46. Petitioner disputed Walsh's contentions in testimony before this court. *See* Evid.Hrg.Tr. II at 7–12.

We find that we are unable to credit Mr. Walsh's testimony on this point. First, we note that counsel's second proffered explanation is somewhat inconsistent with his first. Mr. Walsh's first explanation indicates that *he* (with Petitioner's concurrence, *see* Evid.Hrg.Tr. I at 48–49) decided the most appropriate action to take was to present no mitigating evidence, while the second implies that he did not necessarily think that this was a sound approach, but that he was nonetheless simply following his client's instructions after fully informing him of the relevant considerations. Mr. Walsh seemed to vacillate between these two proffered explanations during his testimony, such that in the end, this court was still somewhat vague as to how the decision was made to introduce nothing in mitigation. This ambiguous and seemingly inconsistent testimony renders Mr. Walsh's version of the facts somewhat less than fully reliable.

Furthermore, in contrast to this apparently inconsistent testimony, Walsh quite consistently testified that at the time of the hearing, he thought that Petitioner would almost certainly be sentenced to death if no mitigating evidence were presented, and also testified that he thoroughly explained this to Petitioner. Evid.Hrg.Tr. I at 49. Again, even if we accept counsel's asser-

tion that he felt Petitioner's family members were hostile toward Petitioner, and even if we also accept that counsel relayed this information to Petitioner, we nonetheless simply cannot make sense of counsel's testimony that he thoroughly explained to Petitioner that, in his opinion, "there was virtually no chance" that the jury would return a verdict against the death penalty without mitigating evidence, but that Petitioner nevertheless staunchly maintained that "he wanted none of [his family members] called" and "didn't think that any evidence should then be put on." We are especially dubious in light of counsel's concession that none of the potential witnesses ever told counsel that they would not testify on Petitioner's behalf or that they wanted Petitioner to be executed. Evid.Hrg.Tr. I at 50. We thus are unable to accept Mr. Walsh's testimony that Petitioner shunned completely the only real possibility, or at least so his counsel indicates he advised him, of convincing the jury that there was a reason to spare his life. Therefore, although the wishes of a client serve to limit the duty of an attorney to investigate and present evidence, *see, e.g.,* *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066; *Mitchell v. Kemp,* 762 F.2d 886, 890 (11th Cir.1985), we find that it was not Petitioner's choice or desire that his counsel not present mitigating evidence on his behalf.

In sum, we cannot find that Walsh's explanations provide a reasonable basis for his decision to present no mitigating evidence at the sentencing hearing. Unlike *Strickland* and *Burger,* the record in this case reveals no strategy which would justify counsel's decision. Instead, without mitigating evidence, counsel essentially left Petitioner with no defense at all. Such an approach, in counsel's own estimation, could only produce the worst possible result for his client and cannot, under these circumstances, be considered "sound trial

---

**38.** Mr. Walsh did argue in closing, albeit very briefly, that Petitioner did not have a significant prior criminal history. We thus accept as reasonable counsel's decision not to introduce evidence concerning the circumstances surrounding Petitioner's incarceration as a juvenile.

While we might have judged the value of this evidence differently, we cannot find that counsel's decision with respect to this evidence fell outside the wide range of reasonable professional assistance.

**1368**

strategy." *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

Having concluded that Petitioner has made the requisite showing under the first prong of the *Strickland* analysis, we must now turn to the second prong of that test— whether counsel's errors were so serious that there is a reasonable probability that they made a difference in the outcome of the sentencing hearing. We conclude that his errors were sufficiently serious to undermine our confidence in the outcome of the proceeding. Counsel's failure to introduce mitigating evidence under the circumstances, combined with his perfunctory and abstract arguments to the jury during the sentencing hearing, defeated the very purpose of that hearing; that is, to ensure that the sentence is an individualized one, taking into account the particularized characteristics of the individual. *See, e.g., Booth v. Maryland*, — U.S. —, —, 107 S.Ct. 2529, 2532, 96 L.Ed.2d 440 (1987) ("[A] jury must make an *'individualized* determination' of whether the defendant in question should be executed...." *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983) (emphasis in original)); *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976); *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976); *Thomas v. Kemp*, 796 F.2d 1322, 1325 (11th Cir.1986); *Tyler v. Kemp*, 755 F.2d 741, 745 (11th Cir.), *cert. denied*, 474 U.S. 1026, 106 S.Ct. 582, 88 L.Ed.2d 564 (1985); *King v. Strickland*, 748 F.2d 1462, 1464 (11th Cir.1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). The jury in this case was given no information to assist it in making an individualized decision about Petitioner. Meaningful humanizing evidence

did exist, but by failing to present that evidence, Mr. Walsh left himself without any argument to make to the jury that a reason existed to spare Petitioner's life. Instead, Walsh was left basically with only general arguments that the death penalty alternative should be rejected and that the responsibility for the decision rested upon the jury. Because the jury was not given the information it needed to make an individualized decision as to Petitioner's fate, we must conclude that its decision simply cannot be deemed reliable.

The harm arising from counsel's failure to present and argue mitigating evidence was compounded by remarks made by both the prosecutor and the trial judge at the sentencing hearing. These comments suggested to the jury that Petitioner bore the burden of convincing it that his life should be spared in order to avoid the death penalty. For example, at the commencement of the hearing, the judge briefly explained the jury's function:

> This sentencing hearing is divided into two possible stages.... If you find the Defendant eligible for the death penalty in the first stage, you must determine the second stage, [sic] if the Court should impose the death penalty upon the Defendant. For this determination, you may hear evidence of aggravation and mitigation regarding the Defendant. Later, I shall also instruct you on *several statutory mitigating factors that if found sufficient by you may preclude* imposition of the Death Penalty.

Tr. at 814 (emphasis added).[39] The court then went on to explain: "If you do not find the Defendant eligible in the first stage, *or if you find* the second stage, [sic] *that sufficient mitigating factors exist to preclude imposition of the Death Penal-*

---

**39.** This comment not only inaccurately implied that the jury must affirmatively find that there are mitigating factors sufficient to preclude a death sentence, *see* discussion *infra*, but also suggested that the jury was required to find a *statutory* mitigating factor in order to prevent the death penalty from being imposed. The statute, however, clearly provides that the statutory mitigating factors do *not* represent an ex-

clusive list. *See* § 9–1(c) ("Mitigating factors *may include but need not be limited to the following:* ..." (emphasis added)). The prosecutor made the same error. *See* Tr. at 922–23 ("Judge Petrarca very shortly will instruct you as to what mitigating factors you may consider." [then proceeded to argue that no statutory mitigating factor had been shown] ). Counsel did not object to these comments.

*ty,* the Court will sentence the Defendant to a term of imprisonment." Tr. at 814–15.

Similarly, at the beginning of the second phase of the hearing, the court stated:

> [Y]ou [the jury] have established that the Defendant is eligible for the Death Penalty. In this second stage of the hearing, you may hear evidence of aggravation and mitigation concerning the Defendant. *You will then determine whether,* after instructions by the Court, *there are any sufficient mitigating factors to preclude the imposition of the Death Sentence upon the Defendant.*

Tr. at 855–56 (emphasis added). Finally, in closing argument, the prosecutor told the jury:

> The State law says that absent mitigating circumstances sufficient to prevent the imposition of the death penalty that the death penalty is to be imposed.... *The law says that the aggravating factors, having been found to exist, which means at the time those aggravating factors are found to exist, the penalty to be imposed is death. Only if there is mitigating circumstances sufficient can you not sentence the Defendant to death.* There having been none, and you not being entitled to create them, you have to follow the law.

Tr. at 931–32 (emphasis added).

 These statements, which permeated the hearing, inevitably planted in the jury's mind the idea that death was the appropriate penalty unless the jury could affirmatively find mitigating factors sufficient to preclude it. However, a review of § 9–1 reveals that both the prosecutor and the judge were inaccurate in their paraphrasing of the law. The statute, contrary to these comments, does not require the jury affirmatively to find the existence of mitigating factors in order to spare the defendant. Rather, the statute reads:

> If the jury determines unanimously that there are *no* mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death.

§ 9–1(g) (emphasis added). The difference is far more than mere semantics. The unanimous determination which the jury must make is not that there *are* mitigating factors sufficient to preclude the imposition of the death sentence, but rather is that there are *no* mitigating factors sufficient to preclude the imposition of the death sentence. In other words, although there is no burden of *production* on either side at the second stage of a death sentencing hearing, *see, e.g.,* § 9–1(e); *People v. Johnson,* 114 Ill.2d 170, 102 Ill.Dec. 342, 358, 499 N.E.2d 1355, 1371 (1986), there is, as there must be, a burden of *persuasion* at this stage, and it is the State which bears the burden of convincing the jury that no factors exist which would justify a decision not to return a death sentence.[40] This burden on the State is reinforced in the statute by the fact that the first sentence, which requires the jury to make an affirmative finding in order to return a death sentence, is immediately followed by a second sentence which mandates incarceration in all cases in which even one juror has not been persuaded to make such a finding. *See* § 9–1(g) (*"Unless* the jury unanimously finds that there are *no* mitigating factors sufficient to preclude the imposition of the death sentence the court *shall* sentence the defendant to a term of imprisonment under Chapter V of the Unified Code of Correc-

---

**40.** We do not read anything to the contrary in the opinions of the Illinois Supreme Court. In *People v. Williams,* 97 Ill.2d 252, 73 Ill.Dec. 360, 365–66, 454 N.E.2d 220, 225–26 (1983), *cert. denied,* 466 U.S. 981, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984) and *People v. Free,* 94 Ill.2d 378, 69 Ill.Dec. 1, 19, 447 N.E.2d 218, 239, *cert. denied,* 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983), the Illinois Supreme Court held only that the State does not bear the burden of persuading the sentencer *beyond a reasonable doubt* that death is the appropriate penalty.

Such holdings are not inconsistent with our reading of the statute that it is the State and not the defendant that bears the burden of persuasion on the question whether the defendant should be sentenced to death. *See also People v. Caballero,* 102 Ill.2d 23, 79 Ill.Dec. 625, 627, 464 N.E.2d 223, 235 (1984) (State need not prove beyond a reasonable doubt that no mitigating factors exist sufficient to preclude death penalty; defendant does not unconstitutionally bear risk of nonpersuasion).

tions." (emphasis added)). Thus, the language of the statute establishes that the presumption is not in favor of the death sentence, as the prosecutor argued and the trial judge at least implied, but rather is in favor of incarceration. Incarceration will be the sentence *unless* the jury can make a unanimous affirmative finding that no mitigating factor exists which is sufficient to preclude a death sentence.

Although the jury instruction on this point was technically correct,[41] *see* Tr. at 938, we think there is a real probability that the jury's understanding of that instruction was hampered by the consistently inaccurate interpretations of the law rendered by the prosecutor and the trial judge himself. The jury in this case may well have erroneously believed that it had to make a unanimous, affirmative finding that one or more mitigating factors existed sufficient to preclude the imposition of the death sentence, and that Petitioner bore the burden of nonpersuasion. Under these circumstances, the harm resulting from Walsh's failure to present and argue the available mitigating evidence is magnified.

We note that even if *our* interpretation of Illinois law is incorrect (as opposed to that offered by the prosecutor and the trial judge), the fact remains that the sentencing hearing was conducted in an atmosphere in which the need for mitigating factors was continually emphasized, and yet Mr. Walsh presented no mitigating evidence and made no meaningful argument in mitigation. Under these circumstances, even if the comments by the prosecutor and the trial judge were accurate statements of law,[42] our confidence in the outcome of the sentencing proceeding is nonetheless undermined.

On the record before us, we conclude that Petitioner received ineffective assistance of counsel at his sentencing hearing. As the *Strickland* Court noted:

The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

466 U.S. at 685, 104 S.Ct. at 2063. In the last analysis, the record demonstrates that counsel, though physically present throughout the sentencing hearing, did not provide Petitioner with the representation to which Petitioner was constitutionally entitled. *See id.* at 685–86, 104 S.Ct. at 2063 ("That a person who happens to be a lawyer is present at trial alongside the accused ... is not enough to satisfy the constitutional command.... For that reason, the Court has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970))). We reiterate the Court's pronouncement that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. On this record, we conclude that Petitioner's claim of ineffectiveness meets this standard. Taking all of the circumstances into account— counsel's failure to engage in significant prehearing investigation; his failure to introduce any mitigating evidence or to otherwise devise a strategy that did not entail the use of such evidence; his failure to meaningfully cross-examine any of the State's witnesses testifying in aggravation; his failure to object to inaccurate and highly prejudicial statements by the prosecutor and the judge; and his failure to attempt to humanize Petitioner in his arguments to

---

**41.** The verdict form is also technically correct, although it, like the jury instruction, modifies the language of the statute. *See* Tr. at 941 ("We unanimously conclude that there are no sufficiently mitigating factors to preclude the imposition of the death sentence upon the Defendant Dickey Gaines....").

**42.** Petitioner has urged in his briefs that the remarks by the prosecutor and the judge were, in fact, accurate expressions of the applicable law, and that the statute is unconstitutional because it shifts the burden of proof on the issue of life or death to the defendant. *See* Pet.Br., May 16, 1986, at 38–46. *See also* Part III *infra*.

the jury or in any way provide the jury with the information it needed to make a rational, individualized decision about Petitioner's fate,—we must conclude, even giving counsel the heavy measure of deference to which his performance is entitled, that Petitioner has succeeded in showing that counsel's representation fell below an objective standard of reasonableness. Moreover, Petitioner has demonstrated a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome, that but for counsel's unprofessional errors, the result of the proceeding would have been different. Counsel simply did not subject the State's case to meaningful adversarial testing that would justify our reliance on the proceeding as having produced a just result. Accordingly, we conclude that Petitioner is entitled to be resentenced.

### III. *Constitutionality of the Illinois Death Penalty Statute*

 Both Petitioner and the State have urged this court to rule on Petitioner's various challenges to the constitutionality of the statute itself.[43] It seems to us, however, that a ruling on the constitutionality of the death penalty statute, given our decision vacating Petitioner's death sentence, would have little, if any, value to the parties in this case. In any event, we heed the Supreme Court's warning:

> The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity. The various doctrines of "standing," "ripeness," and "mootness," which this Court has evolved ... are but several manifestations ... of the primary conception that federal judicial power is to be exercised

to strike down legislation, whether state or federal, only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action. This Court can have no right to pronounce an abstract opinion upon the constitutionality of a State law. Such law must be brought into actual, or threatened operation upon rights properly falling under judicial cognizance, or a remedy is not to be had here. The party who invokes the power [to annul legislation on grounds of its unconstitutionality] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement.

*Poe v. Ullman,* 367 U.S. 497, 503–05, 81 S.Ct. 1752, 1756–57, 6 L.Ed.2d 989 (1961) (citations and footnotes omitted).

Petitioner in this case cannot demonstrate a need for this court to adjudicate his claims that the Illinois death penalty statute is unconstitutional. Petitioner's death sentence has been vacated, and we have ordered that Petitioner be resentenced. At this point, we cannot know with any certainty whether the State will again seek the death penalty. Even if the State does request that a death sentencing hearing be convened, we cannot possibly know whether Petitioner will again be sentenced to death. If the State chooses not to seek the death penalty *or* if it does but the sentencer does not return a death sentence, Petitioner will be sentenced to a term of imprisonment, and the issues he raises regarding the constitutionality of the death penalty statute need not be reached. Accordingly, we cannot find that Petitioner is immediately harmed or even immediately

---

**43.** Petitioner has made nine separate arguments that the statute is unconstitutional: (1) the statute unconstitutionally mandates death in the absence of mitigating evidence; (2) the statute unconstitutionally shifts the burden of proof on the issue of life or death to the defendant; (3) the statute fails to provide constitutionally adequate notice that the State will seek the death penalty; (4) the statute unconstitutionally fails to guard adequately against the arbitrary and capricious imposition of the death penalty; (5) by granting the prosecutor discretion in deciding whether to convene a capital sentencing hearing, the statute unconstitutionally vests an

essentially judicial function in the prosecutor; (6) the statute is unconstitutional because four of the seven justices of the Illinois Supreme Court have so determined; (7) the statute is unconstitutionally vague; (8) the statute fails to provide constitutionally adequate review of death sentences based upon nonstatutory aggravating factors; and (9) the statute unconstitutionally denies equal access to post-conviction review. Petitioner sought discovery and an evidentiary hearing on his claims that the statute is applied discriminatorily, arbitrarily and capriciously.

threatened with harm by the operation of the statute,[44] and under such circumstances, we conclude that it is unnecessary for us to entertain these constitutional questions at this time. We note that Judge Baker of the Central District of Illinois reached the same conclusion earlier this year. *See United States ex rel. Lewis v. Lane,* 656 F.Supp. 181, 195 (C.D.Ill.1987). *See also People v. Holman,* 103 Ill.2d 133, 82 Ill.Dec. 585, 607, 469 N.E.2d 119, 141 (1984), *cert. denied,* 469 U.S. 1220, 105 S.Ct. 1204, 84 L.Ed.2d 347 (1985).

### Conclusion

For all the foregoing reasons, Petitioner's petition for a writ of habeas corpus is granted to the extent that the petition pertains to his death sentence. Petitioner's sentence of death is vacated, and Petitioner is to be resentenced within 120 days of the date of this order. The petition is otherwise denied.

---

**44.** Petitioner has noted to this court that he cannot obtain all the relief he seeks in this habeas petition without a ruling on the statute's constitutionality, since Petitioner desires a ruling that he not again be put through an unconstitutional process. Unless Petitioner is sentenced to death, however, we still do not see how Petitioner can show that he is immediately harmed or immediately threatened with harm by the enforcement of the statute. It is, of course, the unconstitutional imposition of the death penalty with which we are concerned, not the possible displeasure a defendant might experience in being put through the sentencing process.